

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00132-CR

_____

RYAN ANDREW PEUCKER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 18th District Court
Johnson County, Texas
Trial Court No. F48640

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

OPINION

A Johnson County[1] jury found Ryan Andrew Peucker guilty of possession of more than four grams but less than 200 grams of a controlled substance; the jury also found the allegations of Peucker's two prior convictions to be "true"[2] and assessed his punishment at seventy-five years' confinement. On appeal, Peucker contends the trial court erred (1) when it denied his motion to suppress evidence which resulted from a search, and (2) by refusing to grant his request to include in its jury charge an Article 38.23[3] instruction regarding the issue of consent for the search resulting in the discovery of the controlled substance. For the reasons below, we find the trial court did not err when it denied Peucker's motion to suppress or when it refused to include in its jury charge an Article 38.23 instruction regarding the issue of consent. Accordingly, we affirm the trial court's judgment.

I.      **Factual Background**

At approximately noon on April 22, 2014, Officers Robert Duddington and Chad Carter of the Cleburne Police Department (CPD) were dispatched to Hill College to investigate a possible attempted theft of copper wire from one of the four industrial-sized air conditioning units located on the campus.[4] When officers arrived at the initial scene, they were assisted by at least one

---

[1]Originally appealed to the Tenth Court of Appeals in Waco, Peucker's case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). Because this is a transfer case, we apply the precedent of the Waco Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[2]Peucker was also indicted for one count of criminal mischief in the amount of more than $20,000.00 but less than $100,000.00. Prior to voir dire, the State abandoned the criminal mischief charge.

[3]*See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005).

[4]The dispatch call was characterized as suspicious criminal activity. The complainant stated that he had seen two subjects that were beside an air conditioning unit at the college campus.

witness who described two people who were suspected of participating in the attempted theft: one of the subjects was described as being a black male, and the other was described as being a "white, skinny male" wearing a white or tan shirt and shorts and carrying a walking stick. After assisting in the apprehension of the black male suspect,[5] Duddington received information that the other suspect had been seen at a location approximately one block away. Duddington drove toward the location, but was directed by another witness toward the missing suspect's location. Duddington continued as directed and saw a white male wearing a white t-shirt and carrying a stick. Duddington exited his patrol vehicle and twice instructed the suspect—Peucker—to "put the stick down" and then to remove his backpack. Duddington told Peucker to turn around, and he placed him in handcuffs. Duddington asked Peucker what he had been doing in the area where the witnesses saw him, and Peucker responded that he had not been in the reported location and that "all [he] did was [he] went in those bushes, and [he] took a leak." Duddington asked Peucker if he had anything on him (such as drugs or weapons), to which Peucker replied that he had a "razor knife" in his pocket and a box cutter.

Duddington placed Peucker into the patrol car and drove back to the location near the college campus where Carter and the other suspect were located, during which time Peucker identified himself to Duddington. Upon returning to the place the other officers were located, Duddington exited the vehicle and began discussing with the other officers the possibility of charging Peucker with a criminal offense, including attempted theft or theft of copper wiring from the campus air conditioner. Noting that Peucker had been carrying a backpack that might contain

---

[5]Duddington and another officer located the suspect hiding inside of a building described as a shed or garage. Without being asked, the suspect quickly informed the officers that he "wasn't stealing no copper."

tools commonly associated with the theft of copper wiring, Duddington decided to question Peucker. Duddington went back to his patrol vehicle, opened its rear door, and asked Peucker if he had any stolen items in his backpack, to which Peucker responded, "No sir. That's everything I own." Duddington then asked Peucker if he would mind if he "look[ed]" in his backpack. Peucker responded that Duddington should "be careful with it, it's my world" and "it's all I have." Duddington replied with the statement that he was "not going to mess anything up," to which Peucker responded, "Uh, all right." Before Duddington unzipped the large compartment on Peucker's backpack, Peucker informed him, "I have some paraphernalia in there. Maybe a [inaudible] pipe."

While Duddington and Peucker carried on a casual conversation about Peucker's living arrangements, Duddington commenced a search of Peucker's backpack. Additional officers arrived at the scene, and when they passed by with the other suspect, Peucker asked, "That dude right there?" Peucker shook his head and said, "He ain't [sic] my friend." Peucker laughed and then said, "Actually that dude and I don't like each other at all." While Duddington continued with the search, Peucker voluntarily resumed the conversation, asking Duddington, "What did they say happened over there?" "What was I supposed to be stealing?" Duddington then located a hacksaw and a small black case, which he handed to Carter. Duddington also located a set of pliers in Peucker's backpack, which he recognized as tools which could be used for stealing copper wire.

Carter began searching the small black case that Duddington found in Peucker's backpack. Peucker informed Carter that the black case contained paraphernalia, but no needles. When Carter located some marihuana stems in a baggy of sugar, Peucker explained, "They're just stems." He then laughed and said, "I told them I had paraphernalia on me." Peucker continued talking about

4

finding pipes and needles on the street while walking around town and stated that he sometimes kept the pipes but always threw away the needles. When one of the officers asked him what he did with the "big bags of marijuana" he found on the street and whether he smoked them, Peucker began talking about his "so-called friends," laughed, and said, "They're nowhere around." When Carter found what looked to him like a "lock-picking set," Peucker voluntarily explained, "That's my marijuana pipe cleaning set, actually," laughed again and said, "Ya'll know I smoke, man. I used to live right behind you guys," referring to the police station.

Carter also found a small plastic container containing what the officers believed to be marihuana seeds and a cellophane wrapper containing pills.[6] Upon further inspection, Carter located a pink cylinder, a red cylinder, and a silver cylinder, which appeared to be flashlights.[7] However, when Carter opened the silver cylinder, he found a plastic baggy containing what the officers believed to be methamphetamine.[8] Duddington weighed the purported drugs and determined that they weighed in excess of five grams. The officers also performed a "field test" to determine if the substance was methamphetamine. Following the discovery of the suspected methamphetamine, Peucker was placed under arrest, transported to the county law enforcement facility, and booked in on a charge of possession of a controlled substance and possession of marihuana.

---

[6]Peucker claimed "some girl" gave him the pills, which he referred to as anti-depressants or anti-anxiety pills.

[7]The red and pink cylinders contained plastic baggies with the inscription "stay high" on them. Peucker claimed he found the baggies.

[8]When Carter removed the silver cylinder, Peucker immediately informed him that he found the cylinder, that he did not know what was contained inside the cylinder, and that the contents were not his; however, he assured Carter that whatever it was, he promised "on his mother's grave," it was not methamphetamine. Also contained in the pouch were what the officers believed to be (1) a baby-food jar filled with marihuana seeds, (2) a marihuana grinder used to separate the leaves from the seeds and stems, and (3) a glass pipe used to smoke methamphetamine.

As noted previously, on July 8, 2015, a jury found Peucker guilty of possession of more than four grams but less than 200 grams of a controlled substance. The jury also finding the two enhancement paragraphs to be true, it assessed Peucker's punishment at seventy-five years' imprisonment. This appeal followed.

## II.     Peucker's Issues on Appeal

### A.     The Trial Court Did Not Err when it Denied Peucker's Motion to Suppress

#### 1.     Standard of Review

"We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review." *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd). While we defer to the trial court on its determination of historical facts and credibility, we review its application of the law and its resolution of questions not turning on credibility by de novo standards. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Graves*, 307 S.W.3d at 489; *see Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). We also afford deference to a trial court's "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89.

The trial court is the exclusive trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony at the suppression hearing. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). As the trier of fact, the trial court is free to believe or disbelieve all or part of a witness' testimony, even if the testimony is uncontroverted. *Id.* Since all the evidence

6

is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of Peucker's motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case. *See Carmouche*, 10 S.W.3d at 327; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).

### 2. Analysis

Following the hearing on Peucker's motion to suppress, the trial court found, among other things, that: (1) the officers had reasonable suspicion to detain Peucker, (2) they did so for investigative purposes, (3) the scope of the search of Peucker's backpack was reasonable, (4) Peucker was not under custodial arrest when the search was conducted, and (5) Peucker's consent to the search of the backpack was not given as a result of coercion by the police but, rather, the consent was given voluntarily. The trial court denied Peucker's motion and later entered written findings of fact.[9] On appeal, Peucker maintains that the trial court reversibly erred when denying his motion to suppress. We disagree.

---

[9]The trial court's findings are as follows:

1.    Peucker was not under arrest at the time his backpack was searched;

2.    Duddington asked for consent to search his backpack;

3.    Peucker's response was an affirmative, voluntary indication of his consent, either expressed or implied. The court noted that it made this particular finding after judging the credibility of the witnesses' testimonies;

4.    Peucker's consent to search was voluntarily and freely given as determined by the totality of the circumstances;

5.    Peucker's consent was not coerced by explicit or implied means or by implied threat or covert force;

6.    Peucker freely and voluntarily acknowledged possession of paraphernalia and, although under detention, was not under arrest, and *Miranda* warnings were not required at that point in time regarding the matter in question;

7.    The scope of Duddington's search was within the scope of objective reasonableness within that which a typical, reasonable person would have understood to be the exchange between Duddington and Peucker;

### a.   Investigative Detention

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). In *Terry*, the Court adopted a two-part examination to determine the reasonableness of an investigative detention. The first part of the analysis is to determine whether the officer's action at its inception was reasonable. *Id.* at 16–17. An objective standard is applied to determine whether the intrusion was reasonable. *Id*. at 21. The test is whether the facts available to the officer at the time of the seizure or search would cause a man of reasonable caution to believe the action taken by the officer was appropriate. *Id*.

In this case, Duddington and Carter possessed reasonable suspicion to stop and detain Peucker to determine if he had been involved in the criminal act of stealing wire from the campus

---

8.    Duddington's actions were justified at the inception and reasonably related in scope to the circumstances which justified the police action in the first instance;

9.    Duddington did not make any promises to induce Peucker to make the statements he made;

10.    Duddington was a credible witness, and his testimony was consistent with the admitted video recording of the incident;

11.    Duddington had specific, articulable facts to support a reasonable suspicion to believe Peucker was engaged in criminal activity, justifying the search of Peucker's backpack;

12.    Duddington had specific, articulable facts to justify placing Peucker in handcuffs and requiring him to put the stick down;

13.    The officers acted in good faith;

14.    The findings applicable to Duddington were also applicable to Carter;

15.    Looking at the objective purpose of the interview or interrogation, the information was taken in the context of dealing with an ongoing situation or exigency or emergency needing immediate attention, not for testimonial purposes in violation of *Crawford v. Washington*, 541 U.S. 36 (2004); and

16.    Peucker's statements were not hearsay.

air conditioner.  Not only had they received a dispatch call regarding suspicious activity on the campus, but they also spoke to multiple witnesses who provided one or both of them with information relating to the descriptions of the suspects, what the suspects had been seen doing, and the area where both of them could be located.  Based on the record, the trial court was correct in concluding that Duddington and Carter had reasonable suspicion to stop and detain Peucker to determine whether he had been involved in a criminal act (i.e., theft of copper wire from the campus air conditioner).

The second part of an inquiry made pursuant to *Terry* relates to the scope of the detention.  The Court in *Terry* noted that an investigative detention "must, like any other search, be strictly circumscribed by the exigencies which justify its initiation."  *Id*. at 25–26.  A search reasonable at its inception may violate the Fourth Amendment should it become excessively intense or should it exceed the scope of reasonableness.  *Id*. at 18.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the initial purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Cisneros v. State*, 165 S.W.3d 853, 859 (Tex. App.—Texarkana 2005, no pet.).

In this case, after Duddington located Peucker, he drove him back to the initial location, taking less than two minutes to do so.  After a brief discussion with the other officers regarding the potential offenses of which Peucker could be charged, Duddington returned to the patrol vehicle and, after minimal discussion with Peucker, asked if he could search his backpack.  Following a short exchange, Peucker commented, "Uh, alright," after which Peucker volunteered, "I have some paraphernalia in there.  Maybe a [inaudible] pipe."  Duddington's short-duration search of the backpack resulted in the discovery of tools commonly known to be used to steal

9

copper wire, drug paraphernalia, and illicit drugs. Peucker's detention was brief and lasted only so long as it took to effectuate the purpose of the investigation. The trial court did not err when it determined that the investigative detention was within the scope of objective reasonableness.

### b. Explicit or Implied Consent[10]

There is no dispute that when Duddington detained Peucker, he searched his backpack without first obtaining a search warrant. The United States and Texas Constitutions both guarantee the right to be secure from unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. In addition to the Constitutional constraints, the Texas Code of Criminal Procedure forbids any evidence obtained by an unreasonable search to be admitted against an accused. TEX. CODE CRIM. PROC. ANN. art. 38.23(a). When a state official acts without a valid warrant and searches a citizen's private property, that search is per se unreasonable unless an exception to the Fourth Amendment's warrant requirement otherwise permits the search. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003). A well-recognized exception to the search warrant requirement is a search made pursuant to consent. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985). "The federal constitution requires the State to prove the validity of the consent by a preponderance of the

---

[10]There is testimony in the suppression hearing record related to the status of Peucker's detention, and the trial court made a finding related to this issue. Notwithstanding the trial court's finding, on appeal, Peucker does not raise the argument that his detention had been elevated to an arrest. Likewise, he does not assert that Duddington asked him questions and searched his backpack without giving him *Miranda* warnings. Although he points out that he was not given his *Miranda* warnings, Peucker argues only that he did not give Duddington voluntary consent to search his backpack after he had been detained, but was instead coerced into allowing the search because, among other reasons, he had been handcuffed and placed in Duddington's patrol vehicle. For this reason, we decline to address the status of Peucker's detention and will address only the events leading up to the initial stop and the issue of consent.

10

evidence; the Texas Constitution requires the State to show by clear and convincing evidence that the consent was valid." *Rayford*, 125 S.W.3d at 528.

In this case, the State maintains that Peucker consented to the search of his backpack. According to Duddington's testimony, as well as the recording of the incident,[11] following a brief discussion with the other officers on the scene, Duddington returned to his patrol vehicle with the idea that Peucker's backpack might contain evidence (i.e., tools associated with theft of copper wire). When Duddington asked Peucker if he could look in his backpack, Peucker stated, "Be careful with it, it's my world. . . . It's all I have. . . . Uh, all right. I have some paraphernalia in there. Maybe a [inaudible] pipe."

Peucker claims he never explicitly told Duddington that he could search his backpack. On cross-examination, when the State asked Peucker if he gave Duddington consent to search his backpack, Peucker responded, "I asked him to be careful, that's my world, sir." When the State asked a second time, Peucker answered,

> I asked him to be careful, it's my world, sir, not to mess anything up. I didn't consensually give him permission. I feel like I was under arrest. I was being detained, hands behind my back. Usually, I don't get released from a detention, ever. When I'm in handcuffs, I'm arrested, from past experience, sir.

Peucker does not deny that he responded in the manner he did, but he maintains that his words and actions did not amount to express consent. Voluntary consent to search has been found in similar circumstances in which the consent to search was not expressly given. *See Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (appellant "motioned for [the officer] not only to 'come forward' [into his home] but also to 'come in,'" and gestured with his "hand being

---

[11]Duddington was wearing a "body cam" that recorded the incident. The recording was admitted during the hearing.

extended out and coming back toward him"); *Kendrick v. State*, 93 S.W.3d 230, 234 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (appellant indicated his consent to a pat-down search by standing up and raising his hands); *Simpson v. State*, 29 S.W.3d 324, 330 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (appellant consented to search of his car by nodding his head affirmatively, even though he testified that he did not give consent).

Here, the recording of the incident shows that Peucker gave instructions to Duddington before he began his search ("Be careful with it, it's my world."). He also affirmatively responded ("Uh, all right."). Moreover, Peucker informed Duddington of at least some of what was contained in his backpack ("I have some paraphernalia in there. Maybe a [inaudible] pipe."). Duddington testified that based on these comments, he believed that Peucker had given him consent to search his backpack.

Moreover, the standard for determining the scope of a person's consent pursuant to the Fourth Amendment is that of objective reasonableness. *Valtierra v. State*, 310 S.W.3d 442, 449 (Tex. Crim. App. 2010). In other words, what would a reasonable person have understood the exchange between the officer and the suspect to have meant? *Id.* In addition, "[t]he scope of a search is usually defined by its expressed object." *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). However, a person is free to place limits on the scope of the consent that he gives as he chooses the scope of the search to which he originally consented. *Id.* (citing *Jimeno*, 500 U.S. at 252). In addition, "a person's silence in the face of an officer's further actions may imply consent to that further action." *Valtierra*, 310 S.W.3d at 449.

While Duddington was completing his search of Peucker's backpack, Carter also proceeded to search the small black bag with absolutely no opposition from Peucker. In fact, Peucker informed Carter that the small black bag contained drug paraphernalia. Likewise, Peucker answered all of Carter's questions regarding the black bag's contents in a polite and affable fashion. During the entire incident, Peucker conversed with the officers and voluntarily offered additional (although sometimes irrelevant) information.

Peucker's responses to Duddington's initial request to search his backpack fall short of an explicit "yes"; however, his comments were nonetheless positive responses to Duddington's question. There is no reason to think that when Duddington heard Peucker's response of "all right," he attributed anything less to that statement than full acquiescence and consent to the search of his backpack.[12] Moreover, Peucker gave no indication to either Duddington or Carter at any time that they should discontinue searching his belongings. The record shows that Peucker behaved in a manner that a reasonable person could have understood as giving both officers consent to search his backpack. In light of the conflicting evidence, we must defer to the trial court's determination that Peucker's responses and subsequent actions amounted to, at the very least, implied consent.

### c.   Voluntariness of Consent

Peucker argues that even if we construe his comments to be implied consent, they were not made voluntarily but instead were the result of an overpowering police presence. Peucker maintains he had no choice to refuse Duddington's request to search his backpack because (1) he

---

[12]The term "All right" is defined as "used interjectionally, esp. to express agreement or resignation . . . beyond doubt . . . well enough." *All right*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006).

was handcuffed and not free to leave, (2) there were four or five uniformed officers present at the scene, all "brandishing" firearms, and (3) the officers were intent on searching his backpack, regardless of whether they obtained Peucker's consent.

"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'" *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973)). A valid consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). In order to determine whether a person's will was "overborne," a court must "assess[] the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226.

Some factors to consider include: (1) the age of the suspect; (2) the education of the suspect; and (3) the intelligence of the suspect. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000) (citing *Schneckloth*, 412 U.S. at 226). We may also consider "whether the consenting person was in custody, whether he or she was arrested at gunpoint, whether he or she had the option of refusing consent, the constitutional advice given to the accused, the length of detention, the repetitiveness of the questioning, and the use of physical punishment." *Flores v. State*, 172 S.W.3d 742, 749–50 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Laney v. State*, 76 S.W.3d 524, 532 (Tex. App.—[14th Dist.] 2002), *aff'd*, 117 S.W.3d 854 (Tex. Crim. App. 2003). An officer's failure to apprise the suspect that consent can be refused may also be considered. *Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002). "While a warning that an individual does not have to consent to a search and has the right to refuse is not required nor [sic] essential,

14

the showing of a warning is of evidentiary value in determining whether a valid consent was given." *Meeks*, 692 S.W.2d at 510.

In support of Peucker's position that his consent to search was not given voluntarily, he refers us to his testimony during the trial court's hearing on his motion.

> Q.      [By defense counsel] And you recall the moment when Duddington asked for the search of your bag?
>
> A.      [By Peucker] Yes, sir.
>
> Q.      Prior to that, had anybody given you any warnings or any of the statutory -- had they stated any of the statutory protections for a suspect in being interviewed by police, the [*Miranda*] warnings?
>
> A.      No, sir, they didn't.
>
> Q.       And do you recall telling the officer that everything you own was in that bag?
>
> A.      Yes, sir.
>
> Q.      And that you said, "It was my world"?
>
> A.      Yes, sir.
>
> Q.      "It's all I have"?
>
> A.      Yes, sir.
>
> Q.      And the search was commenced by the officer, was it not?
>
> A.      Yes, sir.
>
> Q.      Did you feel like you had the option or the opportunity to say "no[,"] to refuse the search?
>
> A.      No, sir.
>
> Q.      Why do you feel that way?

15

A.      Because I was in handcuffs and feeling basically hopeless, defenseless. I was being detained for whatever reason. I felt like I was under arrest. So I felt like I didn't have a choice in the matter whatsoever.

Q.      Did you feel like they were going to go through the bag anyway?

A.      Yes, sir.

Q.      Do you feel like they would have?

A.      Yes, sir, I know they would have.

Q.      The scene was -- at least in your presence it was -- it was not disorderly, it was calm and controlled, is that right?

A.      Yes, sir.

Q.      And who was it controlled by?

A.      The officers as well as me.

Q.      And if they needed time to obtain a warrant to search your backpack, at least from your perspective, did they appear to have the time they would have needed?

A.      Yes, sir.

Contrary to Peucker's testimony, the trial court found that Peucker's response amounted to voluntary consent. The court also noted that it made this particular finding after judging the credibility of the witnesses' testimony during the hearing.

Here, Peucker claims that his consent to search was coerced because Duddington handcuffed him and placed him in his patrol vehicle.[13] Police officers may use such force as is reasonably necessary to effect the goal of a stop, which would include investigation of suspicious criminal activity, maintenance of the status quo, or officer safety. *Rhodes v. State*, 945 S.W.2d

---

[13]The trial court found that Duddington had specific, articulable facts to justify placing Peucker in handcuffs.

16

115, 117 (Tex. Crim. App. 1997). While the record clearly supports Peucker's testimony that he was handcuffed and placed in Duddington's patrol vehicle, it also clearly shows that he was handcuffed when Duddington found him after he fled the scene. Had Peucker not fled the scene immediately prior to being detained, the fact that he was handcuffed would have carried more weight in support of Peucker's claim that his consent was coerced, and given less relevance as it relates to the necessity of ensuring Puecker's presence in order to further the investigation.

Peucker also maintains that there were several law enforcement officers present at the time he was being questioned and, therefore, he was compelled to consent to the search of his backpack. The record shows, however, that other than Duddington and Carter, the remaining officers were located away from the patrol vehicle and were in the process of having a conversation among themselves. To the extent any of the officers spoke to Peucker directly, they were professional and courteous. The officers were wearing holstered handguns. Being equipped with standard holstered guns does not constitute the "brandishing" of those weapons (a verb that would suggest a random waving or pointing of the pistols). At no time did any of the officers ever either expressly or impliedly indicate that they would resort to using them. In fact, during the trial court's suppression hearing, when his trial counsel asked Peucker the identity of the persons who were controlling the situation, he responded, "The officers as well as me."

In addition, the length of Peucker's detention was reasonable, lasting no longer than was necessary to accomplish the legitimate justification for the investigation. Neither of the investigating officers asked repetitive questions, and they neither delayed the proceedings nor used or threatened the use of any type of physical force in an effort to obtain Peucker's consent to the search. Although Duddington never informed Peucker that he had the right to refuse to consent,

17

he never expressly stated or implied that he was required to allow him to search his backpack. In addition, Peucker cooperated with the officers, sometimes volunteering information without being asked a question. At times, he even joked and laughed with the officers. We note that Peucker was not given his *Miranda* warnings; however, at the time Duddington asked Peucker for consent to search his backpack, the officer did not have probable cause to place him under arrest, thereby obviating the requirement to give him the warnings.

During a hearing on a motion to suppress, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *Ross*, 32 S.W.3d at 855. As the trier of fact, the trial court is free to believe or disbelieve all or part of a witness' testimony. *Id*. In this case, it appears that the trial court chose to resolve any inconsistencies between Duddington's testimony and Peucker's testimony in favor of Duddington. Based on the totality of the circumstances, the State met its burden of proving by clear and convincing evidence that Peucker's consent was freely and voluntarily given. Therefore, we find the trial court did not abuse its discretion when it denied his motion to suppress.

We overrule Peucker's first point of error.

## B. The Trial Court's Jury Instructions Were Sufficient

In his second issue, Peucker contends that the trial court erred when it denied his request to submit a jury instruction regarding the voluntariness of his consent to search as provided in Article 38.23 of the Texas Code of Criminal Procedure. Peucker contends that the issue was raised during the guilt/innocence phase of the trial and, therefore, was a fact issue that should have been submitted to the jury.

18

### 1. Standard of Review and Applicable Law

Article 38.23(a) of the Texas Code of Criminal Procedure states:

> (a)    No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a).

To be entitled to an Article 38.23(a) jury instruction, a defendant must show that (1) an issue of historical fact was raised in front of the jury; (2) the fact was contested by affirmative evidence at trial; and (3) the fact is material to the constitutional or statutory violation that the defendant has identified as rendering the particular evidence inadmissible. *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). When a disputed material issue of fact exists, the terms of the statute are mandatory, and the jury must be instructed accordingly. *Id*. at 510–11. Evidence to justify an Article 38.23(a) instruction can come "from any source," regardless of whether it is "strong, weak, contradicted, unimpeached, or unbelievable." *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004) (quoting *Wilkerson v. State*, 933 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd)). When an issue raised by the evidence at trial does not involve controverted historical facts, but only the appropriate application of the law to undisputed facts, that issue is properly left to the trial court's determination. *Mahaffey v. State*, 364 S.W.3d 908, 912 n.8 (Tex. Crim. App. 2012).

A review of an alleged error in a jury charge involves a two-step inquiry. First, we must determine whether error in the jury charge exists. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). Second, if error is shown to exist, we determine whether the defendant properly preserved the error at trial. *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). If the error was preserved properly, reversal is required if there is "some harm" to the defendant. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). However, if the error was not properly preserved, the error must be "fundamental." In order for error to be fundamental, the error must be "so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios*, 283 S.W.3d at 350 (quoting *Almanza*, 686 S.W.2d at 171).

## 2. Analysis

Peucker maintains that there was a material issue of fact as to whether his consent to search was given freely and voluntarily, or (if he actually consented) whether that consent was coerced by the officers. Peucker contends that if the jury had been properly instructed, it would have been required to disregard the methamphetamine found in his backpack if it believed that he did not give consent to the search or that the police officers coerced him into consenting to the search. According to Peucker, this is sufficient to show he was harmed by the trial court's failure to include the instruction.

Here, the trial court held a charge conference on the record, and Peucker specifically asked for an Article 38.23 jury instruction on the issue of consent. In doing so, Peucker's counsel argued,

> The facts are in dispute. The officers, there's at least four officers surrounding [Peucker] who is handcuffed inside of a police car, and then they ask him if we can look in your backpack. It's coercive in nature. The whole

20

surroundings are coercive. They are coercive facts. [Peucker] shouldn't have to testify that he felt coerced in front of the Jury, because by my examination of the officers they described a -- their answers described a coercive atmosphere. And [Peucker] should be allowed to submit the involuntariness, the illegal search to a Jury without him testifying.

It's -- it is a question of fact for the finder of fact.

Finding there was no coercive conduct by the police officers, the trial court denied Peucker's request for additional jury instructions.

The first sentence of Article 38.23 is relevant to the admissibility of evidence, which is determined exclusively by the trial court. *Pierce v. State*, 32 S.W.3d 247, 251 (Tex. Crim. App. 2000). The second sentence of Article 38.23 relates to the trial court's instructions to the jury. *Id.* "This sentence can operate only if the trial court has admitted evidence, and only if there is a contested issue of fact about the obtaining of the evidence." *Id.* There is neither a reason to instruct the jury if the suppression of evidence is a legal question nor unless affirmative evidence exists that raises a contested fact issue. *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007).

Here, no material fact issue was raised in relation to whether he consented. The facts leading up to Peucker's consent to search and the events that unfolded at the time of his consent are not contested. That Peucker disagrees with the trial court's conclusion that his consent was voluntarily given is not the same as controverting the underlying facts. Peucker's argument is one relating to the legal significance of undisputed facts, which is a matter more properly left to the determination of the trial court, rather than the jury. *See Robinson v. State*, 377 S.W.3d 712, 719–20 (Tex. Crim. App. 2012). Therefore, the trial court did not err when it denied Peucker's requested jury instruction.

We overrule Peucker's second point of error.

21

## III.    Conclusion

We affirm the judgment of the trial court.



Bailey C. Moseley
Justice


Date Submitted:    February 23, 2016
Date Decided:      April 29, 2016

Publish